UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

LINDA BILLADO                                    CIVIL ACTION

VERSUS                                           NO. 07-8289

MICHAEL J. ASTRUE, COMMISSIONER                  SECTION "N" (2)
OF SOCIAL SECURITY ADMINISTRATION


**ORDER ON MOTION, AND FINDINGS AND RECOMMENDATION**

Plaintiff, Linda Billado, seeks judicial review pursuant to Section 405(g) of the

Social Security Act (the "Act") of the final decision of the Commissioner of the Social

Security Administration (the "Commissioner"), denying plaintiff's claim for disability

insurance benefits ("DIB") and supplemental security income benefits ("SSI") under

Titles II and XVI, respectively, of the Act. 42 U.S.C. §§ 405(g), 423, 1381a. This matter

was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and

Local Rule 73.2E(B).

As ordered, plaintiff filed a timely Memorandum of Facts and Law. Record Doc.

No. 13. Defendant filed a timely reply memorandum. Record Doc. No. 14.

I.      PROCEDURAL HISTORY

Billado filed an application for DIB and SSI on February 8, 2005, alleging

disability since June 6, 2004 as a result of a fused shoulder and a knee injury. (Tr. 44-48,

50, 53-54). After her application was denied, she requested a hearing, which was held before an Administrative Law Judge ("ALJ") on May 10, 2007. (Tr. 273-306). On May 25, 2007, the ALJ issued a decision denying plaintiff's application. (Tr. 10-19). After the Appeals Council denied review on July 26, 2007, the ALJ's decision became the final decision of the Commissioner for purposes of this court's review. (Tr. 3-5).

II.   STATEMENT OF ISSUES ON APPEAL

Plaintiff contends that the ALJ made the following errors:

A.   The ALJ erred by failing to give proper weight to the opinion of plaintiff's treating physician.

B.   The ALJ's residual functional capacity assessment is not supported by substantial evidence.

Billado attached to her memorandum two exhibits that are not in the administrative record. The court treats this as a motion for leave to submit new evidence.

III.   ALJ'S FINDINGS RELEVANT TO ISSUES ON APPEAL

The ALJ made the following relevant findings:

1.   Plaintiff has severe impairments consisting of a fused left shoulder and major depressive disorder.

2.   She does not have an impairment or combination of impairments that meet or equal any listed impairments found at 20 CFR, Part 404, Subpart P, Appendix 1.

3.   Plaintiff has the residual functional capacity to stand or walk for three to four hours and sit for six hours in an eight-hour work day, provided that she

2

can alternate sitting and standing.  She is able to understand, remember and carry out detailed but not highly complex instructions.  She can attend and concentrate for an extended period of time, deal appropriately with co-workers and peers, and respond appropriately to occasional routine work changes.  She has the following additional restrictions:  she needs a clean working environment with no fumes, odors, dust, gases or poor ventilation; no driving; no overhead reaching with the left upper extremity; no balancing; no climbing ladders, ropes or scaffolds; and no work around hazardous machinery or heights.

4.   Billado's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but her statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

5.   Plaintiff cannot perform her past relevant work as a landscape supervisor, convenience store clerk or animal control officer.

6.   Considering her age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Billado can perform.

(Tr. 12-19).

IV.   <u>ANALYSIS</u>

A.   <u>Standards of Review</u>

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence.  <u>Perez v. Barnhart</u>, 415 F.3d 457, 461 (5th Cir. 2005); <u>Waters v. Barnhart</u>, 276 F.3d 716, 716 (5th Cir. 2002); <u>Loza v. Apfel</u>, 219 F.3d

378, 390 (5th Cir. 2000).  Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Perez, 415 F.3d at 461; Loza, 219 F.3d 393.  This court may not "reweigh the evidence in the record, try the issues de novo or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision."  Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000).  The Commissioner, rather than the courts, must resolve conflicts in the evidence.  Id.

The ALJ is entitled to make any finding that is supported by substantial evidence, regardless whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91 (1992).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence supports it.  Perez, 415 F.3d at 461.  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Id.; Newton, 209 F.3d at 452; Martinez v. Chater, 64 F.3d 172, 173 (5th Cir. 1995).

To be considered disabled and eligible for SSI or DIB,[1] plaintiff must show that she is unable "to engage in any substantial gainful activity by reason of any medically

---

[1]The relevant law and regulations governing a claim for DIB are identical to those governing a claim for SSI.  Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994); Hollis v. Bowen, 837 F.2d 1378, 1382 n.3 (5th Cir. 1988).

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than twelve

months." 42 U.S.C. §§ 423(d)(1)(A).  The Commissioner has promulgated regulations

that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§

404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (2007).  The regulations

include a five-step evaluation process for determining whether an impairment prevents

a person from engaging in any substantial gainful activity.  Id. §§ 404.1520, 416.920;

Perez, 415 F.3d at 461; Waters, 276 F.3d at 716; Loza, 219 F.3d at 393.[2]  The five-step

---

[2]The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled.  20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education, and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  Id. §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns.  When the findings made with respect to a claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled.  Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 (2004) ("Medical-Vocational Guidelines").

inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled. Perez, 415 F.3d at 461.

The claimant has the burden of proof under the first four parts of the inquiry. If she successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy that the claimant is capable of performing. When the Commissioner shows that the claimant is capable of engaging in alternative employment, the burden of proof shifts back to the claimant to rebut this finding. Id.; Newton, 209 F.3d at 453.

The court "weigh[s] four elements of proof when determining whether there is substantial evidence of disability: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) [her] age, education, and work history." Martinez, 64 F.3d at 174.

B.    Factual Background

Billado testified that she was 47 years old, had completed high school and had been certified in sewer and water management between 2000 and 2004. She stated that her last job, which ended in June 2004, was as a landscape supervisor for Jellystone Park in Robert, Louisiana, for nine years. She said she had previously worked as a stock clerk and cashier in a convenience store and, before moving to Louisiana, as an animal control

officer in Vermont for nine years.  (Tr. 277-78).  She said she earned some money mowing grass during the first five months of 2005.  (Tr. 278-79).

Plaintiff stated that she injured her left knee on the job at Jellystone Park and had to have surgery on the knee.  She said that Jellystone Park terminated her employment while she was on medical leave.  She testified that her doctor told her that her only remaining option was to have a knee replacement, but he recommended that she wait because of her age.  (Tr. 279).

Billado testified that she has epilepsy and that she injured her left shoulder during a grand mal seizure in 1980.  She said she had one seizure in 1985 and two seizures on March 8, 2007.  She stated that she had undergone five surgeries on her shoulder in Vermont and three surgeries in Louisiana, the last one being a shoulder fusion, so that she can no longer lift her left arm.  She said she can use her left arm only from her elbow to her wrist.

Plaintiff testified that she sees Dr. Michael Saucier, a chronic pain management physician at Ochsner.  She said that she is heavily medicated for pain and has difficulty staying awake because of the medications.  She stated that her pain stays at eight or nine on a scale of ten, even with the medications.

Plaintiff said that she takes eight pills of oxycodone with acetaminophen,[3] eight pills of morphine sulfate[4] and three pills of Soma daily.[5]  She stated that she takes Mobic[6]

----

[3]Percocet (generic ingredients: acetaminophen, oxycodone hydrochloride),
a narcotic analgesic, is used to treat moderate to moderately severe pain.  It contains two drugs—acetaminophen and oxycodone.  Acetaminophen is used to reduce both pain and fever.  Oxycodone, a narcotic analgesic, is used for its calming effect and for pain. . . . Side effects may include:  Dizziness, light-headedness, nausea, sedation, vomiting[.]
PDRHealth website, at
http://www.pdrhealth.com/drugs/rx/rx-mono.aspx?contentFileName=Per1326.html&contentName=Percocet&contentId=429.

[4]MS Contin (generic name:  morphine sulfate),
a controlled-release tablet containing morphine, is used to relieve moderate to severe pain.  While regular morphine is usually given every 4 hours, MS Contin is typically taken every 12 hours—only twice a day. . . .  The drugs are intended for people who need a morphine painkiller for more than just a few days. . . .  Side effects may include:  Anxiety, constipation, depressed or irritable mood, dizziness, drowsiness, exaggerated sense of well-being, light-headedness, nausea, sedation, sweating, vomiting[.]
Id. at
http://www.pdrhealth.com/drugs/rx/rx-mono.aspx?contentFileName=MSc1277.html&contentName=MS+Contin&contentId=367.

[5]Soma (generic name: carisoprodol)
is used, along with rest, physical therapy, and other measures, for the relief of acute, painful muscle strains and spasms. . . .  Side effects may include:  Agitation, depression, dizziness, drowsiness, facial flushing, fainting, headache, hiccups, inability to fall or stay asleep, irritability, light-headedness upon standing up, loss of coordination, nausea, rapid heart rate, stomach upset, tremors, vertigo, vomiting[.]
Id. at
http://www.pdrhealth.com/drugs/rx/rx-mono.aspx?contentFileName=Som1409.html&contentName=Soma&contentId=532.

[6]Mobic (generic name:  meloxicam) "is a nonsteroidal anti-inflammatory drug (NSAID) in prescription form.  It is used to relieve the pain and stiffness of osteoarthritis and rheumatoid arthritis. . . . Side effects may include:  Diarrhea, flu-like symptoms, indigestion, nausea, headaches, dizziness, rash[.]"  Id. at
http://www.pdrhealth.com/drugs/rx/rx-mono.aspx?contentFileName=Mob1546.html&contentName=Mobic&contentId=360.

for her knee and phenobarbital[7] for epilepsy, which she said makes her sleepy.  She testified that her left shoulder has been inactive since 1980 and that the fusion made it even more inactive.  She said that, because she uses her right arm for everything, her right arm has started locking up and she now has pain in her right shoulder as well as in the left shoulder.  (Tr. 280-81).

Billado stated that she has muscle loss in her left arm.  She testified that she had two operations on her left knee in 2004 to repair a torn meniscus, that her left knee gives out and that, because there is no cartilage in the knee, the bones grind on each other.  (Tr. 282).  She said her orthopedic surgeon, Dr. Devraj, has told her that the only relief would be a knee replacement, but he feels that she is too young to have it now.  (Tr. 282-83).  She stated that she has no insurance and no money for a knee replacement.

Billado testified that she has a seizure disorder and that she last had a seizure in March 2007, when she had two of them.  She said she knows when one is coming because she gets a strange taste in her mouth, sees an aura or a lot of white dots and her vision becomes blurred, so she sits down before it happens.  (Tr. 283).  She stated that

---

[7]"Phenobarbital, a barbiturate, is used as a sleep aid and in the treatment of certain types of epilepsy, including generalized or grand mal seizures and partial seizures. . . .  Side effects may include: Allergic reaction, drowsiness, headache, lethargy, nausea, oversedation, sleepiness, slowed or delayed breathing, vertigo, vomiting[.]"  Id. at http://www.pdrhealth.com/drugs/rx/rx-mono.aspx?contentFileName=Phe1334.html&contentName=Phenobarbital&contentId=437.

she surrendered her driver's license after the last occurrence and that her doctor will review her condition in six months to see if she can safely drive again.

Plaintiff said that she has been seeing her treating physician, Dr. Hudspeth, since 1998.  She testified that she lives with her partner.  (Tr. 284).  She said that she has symptoms of depression, including crying and feeling useless, because she is incapable of doing much.  She stated that she is on medication for depression, that her doctor recently increased the dosage and that she is waiting to see if the increase helps.  Billado testified that sometimes her depression affects her memory and her ability to get along with people.  (Tr. 285).  She said she makes written lists, but then forgets to look at the list or forgets where she put it.  (Tr. 285-86).  She stated that most of her depressive symptoms started after she stopped working as a result of her physical problems.

Plaintiff said that she tries to help with the household chores.  She testified that she cannot groom her own hair or take off certain shirts or jackets without help.  She said she no longer can shop for groceries by herself, but goes with her partner to the grocery store. She stated that she spends her days watching television, trying to teach herself things on the Internet, sitting in the sun and playing with her dogs a little.  (Tr. 286).

Billado testified that she can still perform her woodworking hobby with one hand, but she is more limited now physically than she was when she was working.  She stated that she could probably stand for two hours during an eight-hour day, but she is limited

10

by her left knee.  She said that she walks with a limp and that her knee swells and becomes uncomfortable after walking about one-half mile. (Tr. 287).  She stated that she can lift a gallon of milk or about ten pounds, or maybe a little more than that.  She testified that she cannot use her left arm overhead and can use it only from the elbow down to reach things in front of her at waist level.  She stated that she cannot perform her prior job because she cannot shovel or plant things.  (Tr. 288).  She said her right arm hurts so much that she cannot do any such work.

Plaintiff testified that she might be able to sit at a desk job but she becomes uncomfortable, her leg gets stiff and her shoulder starts burning, so that she has to get up and move around.  She stated that she has a constant burning sensation, throbbing and aching in her shoulder.  She said she could not sit and type all day.  (Tr. 289).

C.   <u>Vocational Expert Testimony</u>

A vocational expert, John Yent, testified at the hearing.  The ALJ asked Yent to assume a hypothetical claimant with a high school education, a certificate in sewer and water management, plaintiff's past relevant work and an alleged disability onset date of June 6, 2004 at age 45.  The hypothetical claimant would need a clean working environment free from odors, dust, gases and poor ventilation and would be unable to drive, balance, climb, work at unprotected heights or around hazardous machinery as a condition of employment.  She could not reach overhead with her left upper extremity,

11

could stand for three to four hours and sit for six hours in an eight-hour day.  She would be capable of understanding, remembering and carrying out detailed, but not highly complex, directions.  She could attend and concentrate for extended periods and could deal appropriately with work place peers, bosses and occasional routine work changes. (Tr. 291-92).

Yent testified that such a claimant could not perform any of plaintiff's past relevant work as a landscape supervisor, convenience store clerk or animal control officer, all of which he classified as light duty, because they require considerable driving, overhead reaching and/or bilateral and bi-manual abilities.  (Tr. 292).  He stated that the claimant could perform a significant number of light and sedentary jobs, including semi-skilled cashier, although the number of available cashier jobs would be reduced by 75 percent for light and 50 percent for sedentary, based on the limitations in the hypothetical.  (Tr. 293-94).  Yent said that other options included telemarketer, a sedentary position, reduced by ten percent because of the nature of the work and the limitations of the hypothetical, and customer service representative, either light or sedentary, with the numbers reduced by 75 percent and 50 percent, respectively.  (Tr. 294-95).  He stated that all of these jobs would allow the claimant to alternate sitting with standing and some walking.

Yent testified that, in any of these jobs, the hypothetical claimant would have to show up for work and that most employers have an attendance policy that allows for missing one day per month on average over the course of a year, so she could miss work about once a month because of excruciating pain, side effects of medication, doctor's appointments or for whatever reason. (Tr. 296-97). However, he stated that a person who misses a couple of days per month or more would not be able to work at any job in the national economy. (Tr. 297).

Yent stated that the standard job allows one fifteen-minute break in the morning and one in the afternoon, with either a half-hour or one-hour lunch break and short breaks during the day to use the restroom. He stated that a person who needed to take longer breaks than these because of fatigue, seizures or doctor's appointments would be subject to termination by her employer, particularly at the lower skill level jobs, because it is very easy for employers to replace those workers. (Tr. 297-98). He stated that such an individual would be unemployable, absent special accommodations, and that an inability to work an eight-hour day would preclude full-time employment at the level of substantial gainful activity. (Tr. 298-300).

Upon cross-examination, Yent testified that a claimant with the limitations listed by the ALJ in his first hypothetical, plus the seven moderate limitations in mental activity

listed in Exhibit 4F,[8] would find it very difficult, but not impossible, to keep one of the jobs he had previously described.  He stated that, to account for these additional limitations, he would make a further reduction of the available numbers, so that the number of cashier jobs available would be reduced by 90 percent for light and 75 percent for sedentary jobs; telemarketer jobs would be reduced by 50 percent; and customer service representative jobs would be reduced by 90 percent for light and 75 percent for sedentary jobs.  (Tr. 301-03).

Yent testified that he made different adjustments for light and sedentary jobs, even though the claimant's mental activity limitations are the same, because of the generally more relaxed environment in sedentary jobs compared to the more physically demanding light duty jobs, and the possibly more demanding clientele with whom the worker might interact in light duty jobs.  He said it would be easier to accommodate a person with those nonexertional limitations in a sedentary than a light job.  (Tr. 303-04).  He reiterated that a claimant with these combined limitations would find it difficult, but not

---

[8]Exhibit 4F is a Mental Residual Functional Capacity Assessment by State agency consultant Tommy T. Stigall, Ph.D.  Dr. Stigall assessed moderate limitations in plaintiff's abilities to (1) maintain attention and concentration for extended periods; (2) perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; (3) work in coordination with or proximity to others without being distracted by them; (4) complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; (5) interact appropriately with the general public; (6) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and (7) set realistic goals or make plans independently of others.  (Tr. 196-98).

impossible, to maintain a job, although he admitted that in the majority of settings it would be impossible.  Yent stated that, in his experience, a person with chronic pain typically tends to be unable to maintain competitive employment for lengthy periods of time.  (Tr. 305).

D.     Medical Evidence

I have reviewed the medical records in evidence and the ALJ's summary of the medical evidence.  (Tr. 14-17).  I find the ALJ's summary of the medical evidence substantially correct and incorporate it herein by reference, with the modifications, corrections and highlights noted below.

E.     Plaintiff's Appeal

1.     Plaintiff's new evidence does not warrant a remand.

In support of her argument that the ALJ erred by failing to accord controlling weight to the opinion of plaintiff's treating physician, Ted J. Hudspeth, M.D.,  Billado attached to her memorandum two exhibits that are not in the administrative record.  Record Doc. Nos. 13-2, 13-3.  These exhibits appear to have been printed from the State of Louisiana Board of Medical Examiners website.  They purport to state the dates on which Dr. Hudspeth and Christina Levings, M.D., a consultative examiner who examined plaintiff, were each licensed to practice Medicine and Surgery in Louisiana.

15

Billado argues, in part, that the ALJ erred by affording more weight to the opinion of Dr. Levings than to that of Dr. Hudspeth because these exhibits show that Dr. Hudspeth was licensed to practice in Louisiana in 1990, while Dr. Levings was not licensed to practice in this state until 2004. The court treats this portion of plaintiff's memorandum as a motion for leave to submit new evidence.

This court may not issue factual findings on new medical evidence and may review such evidence only to determine if a remand is appropriate. Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995); Haywood v. Sullivan, 888 F.2d 1463, 1471 (5th Cir. 1989). Accordingly, the court must determine whether the case should be remanded so that the Commissioner may consider this allegedly new and material evidence.

The court may remand for consideration of new evidence only upon a showing that the evidence is new and material and that good cause exists for the failure to incorporate such evidence into the record in a prior proceeding. 42 U.S.C. § 405(g); Garson v. Barnhart, 162 Fed. Appx. 301, 2006 WL 73365, at *2 (5th Cir. 2006) (citing Leggett v. Chater, 67 F.3d 558, 567 (5th Cir. 1995)).

"New evidence may be grounds for remand if it is material; this materiality inquiry requires determining whether the evidence relates to the time period for which the disability benefits were denied, and whether there is a reasonable probability that the new

16

evidence would change the outcome of the Commissioner's decision." <u>Castillo v. Barnhart</u>, 325 F.3d 550, 551-52 (5th Cir. 2003) (emphasis added).

Billado has cited no law to support her argument that the date when a physician was licensed to practice in the State of Louisiana is material to any determination that the Commissioner is required to make.  In the absence of any such law, I find that the evidence is not material.

Moreover, plaintiff has not demonstrated a reasonable probability that the proffered evidence would change the outcome of the Commissioner's decision.  Under the Commissioner's regulations, all licensed physicians are "acceptable medical sources" whose opinions may be considered when determining whether a claimant is disabled. 20 C.F.R. § 404.1513(a)(1).  Because both Drs. Hudspeth and Levings were acceptable medical sources whose opinions the ALJ considered, Billado has not shown a reasonable probability that the dates when each physician was licensed to practice in Louisiana would change the outcome of the ALJ's determination.

Accordingly, plaintiff's motion for leave to submit new evidence is denied.  The court will neither consider the proffered new evidence nor remand the case so that the Commissioner may consider the evidence.

   2.   <u>The ALJ did not fail to give proper weight to the opinion of plaintiff's treating physician.</u>

Billado argues that the ALJ erred by failing to afford greater weight to the opinion of her treating physician, Dr. Hudspeth.  She contends that the ALJ erred because he did not mention Dr. Hudspeth's residual functional capacity assessment and because he instead gave controlling weight to the opinion of Dr. Levings, a consultative examiner. Citing <u>Newton v. Apfel</u>, 209 F.3d 448 (5th Cir. 2000), plaintiff argues that the ALJ was required to grant controlling weight to Dr. Hudspeth's treating source opinion and that, even if he did not grant the opinion controlling weight, he should have addressed the several factors listed in 20 C.F.R. § 404.1527 to explain his rejection of the opinion.

The Fifth Circuit held in <u>Newton</u> that, "<u>absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist</u>, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)."  <u>Id.</u> at 453 (emphasis added).  Contrary to plaintiff's argument, substantial medical evidence from <u>examining</u> physicians controverts Dr. Hudspeth's opinion.  Therefore, the ALJ was not required to address the detailed criteria of Section 404.1527(d)(2) when rejecting Dr. Hudspeth's opinion.

Plaintiff's memorandum is rife with errors concerning Dr. Hudspeth's opinions. See Plaintiff's memorandum, Record Doc. No. 13, at pp. 4-5.  Billado states that Dr. Hudspeth performed a "mental residual functional capacity assessment," when Dr. Hudspeth opined only concerning plaintiff's physical abilities; she cites the wrong date and the wrong transcript page number for Dr. Hudspeth's assessment of her physical residual functional capacity; she incorrectly cites the findings of a physical therapist as Dr. Hudspeth's findings; and she states that Dr. Hudspeth "determined that plaintiff was limited to less than a sedentary [residual functional capacity]," a statement that does not appear in the record, from Dr. Hudspeth or any other physician or therapist.  Billado also argues that the ALJ relied only on the findings of a non-examining physician to reject Dr. Hudspeth's opinions, which is plainly erroneous and contradicts her own earlier discussion of the ALJ's reliance on the opinions of two consultative examiners, Dr. Levings and Brian Murphy, Ph.D.

The multiple errors in plaintiff's memorandum make it difficult to ascertain and address the merits of her argument.  Nonetheless, I find that the ALJ did not err by failing to accord controlling weight to Dr. Hudspeth's (actual) opinions.

Plaintiff relies primarily on a checklist form completed by Dr. Hudspeth on March 3, 2007 on which he checked "yes" in response to seven listed symptoms/signs tailored to Billado's ailments, and he checked "no" in response to five questions about

19

her "residual functional capacity to be a permanent, full-time employee in a position with the [five listed] daily requirements without exacerbating her condition or causing her significant pain." (Tr. 219). The ALJ did not specifically address this document in his decision.

> However, the
>
> ALJ's failure to mention a particular piece of evidence does not necessarily mean that he failed to consider it, and the ALJ's decision states explicitly that he considered the entire record in his decision. . . . Procedural errors constitute bases for remand only where they cast into doubt the existence of substantial evidence to support the ALJ's decision.

Hammond v. Barnhart, 124 Fed. Appx. 847, 2005 WL 548253, at *3 & n.10 (5th Cir. 2005).

The ALJ included a discussion of Dr. Hudspeth's progress note dated November 29, 2006, in which the doctor stated that plaintiff complained of back and knee pain and that she "presented me with a form printed out by her attorney for me to sign concerning things she could or could not do based on my opinion. At this time, I do not have an opinion as I have not really been the one working all of this up and she has not had any functional capacity [test that shows] her abilities." (Tr. 227).

Billado's last visit to Dr. Hudspeth before this visit was on October 28, 2003, more than seven months before the June 6, 2004 alleged onset date of her disability and more than three years before the November 29, 2006 visit when Dr. Hudspeth admitted that he

did not have enough information to render an opinion concerning her functional abilities. (Tr. 229).  Although plaintiff contends that the ALJ erred by not taking into account her lengthy treatment record with Dr. Hudspeth since 1997, her failure to mention this three-year gap in his treatment of her undermines her argument that his March 3, 2007 checklist opinion was based on a lengthy treatment relationship at that time.  See Hernandez v. Astrue, No. 07-51160, 2008 WL 2037273, at *6 n.4 (5th Cir. May 13, 2008) (quoting 20 C.F.R. § 404.1502) (A treating physician is one "who has provided medical treatment or evaluation and 'who has, or has had, an ongoing treatment relationship with' the claimant.  Given that [a doctor] examined [plaintiff] only two times during the insured period (and only one time thereafter), the record does not reflect that they had an ongoing treatment relationship."); 20 C.F.R. § 404.1502 ("We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s).").

Dr. Hudspeth ordered a functional capacity evaluation, which was performed by a physical therapist on January 4, 2007.  The test revealed that Billado

> is strictly limited in any 2-handed lifting past her waist and any 2-handed overhead tasks[,] . . . any tasks requiring leaning onto the left upper extremity[, and ] . . . in squatting/crouching, kneeling and climbing.  She is able to walk, stand, and sit with frequent position changes.  She is able

> to use her hands with good dexterity and coordination and to do forward
> lean work in sitting.

(Tr. 251).  The ALJ incorporated these limitations into his residual functional capacity

findings.  The limitations noted by Dr. Hudspeth on his March 3, 2007 checklist form,

that plaintiff cannot stand or walk for two hours in an eight-hour day and cannot sit for

six hours in an eight-hour day (Tr. 219), are not supported by the January 2007 functional

capacity test or by other substantial evidence in the record and were not accepted by the

ALJ.

The ALJ also addressed Dr. Hudspeth's provider note dated March 16, 2007, less

than two weeks after Dr. Hudspeth completed the checklist form.  That treatment note,

like the November 29, 2006 note from plaintiff's previous visit, contained none of the

limitations described in the March 3, 2007 checklist.  (Tr. 222-23).

The ALJ considered and assigned minimum weight to an identical checklist form

completed by Michael Saucier, M.D., on November 3, 2006, on which Dr. Saucier also

checked off that plaintiff cannot stand or walk for two hours in an eight-hour day and

cannot sit for six hours in an eight-hour day.  (Tr. 220).  The ALJ's conclusion that Dr.

Saucier's opinions in this regard were unsupported by any clinical or objective findings

is based on substantial evidence in the record and implies a conclusion that Dr.

Hudspeth's identical opinions were similarly unsubstantiated.

As the ALJ noted, there was substantial conflicting evidence from consultative examiners Dr. Levings (Tr. 200-04) and Dr. Murphy (Tr. 178-81), as well as from the non-examining State agency consultant, Dr. Stigall (Tr. 182-98), that plaintiff had only moderate limitations in her functioning and that she could perform substantial gainful activity with the limitations noted in the ALJ's opinion. The ALJ properly assigned great weight to these examining source opinions, which were based on thorough examinations and were consistent with substantial evidence in the record as a whole, including Dr. Stigall's evaluation.

Accordingly, this assignment of error lacks merit.

3.    The ALJ's residual functional capacity assessment is supported by substantial evidence.

For the same reasons explained in the preceding section, the ALJ's residual functional capacity assessment is supported by substantial evidence. Billado argues that the vocational expert testified that she could not perform any work with the severe limitations that she contends she has. The ALJ posed a hypothetical to the vocational expert that accounted for plaintiff's age, education, work experience and mental and physical limitations, which the ALJ found to be credible. The vocational expert testified that jobs were available that a claimant with plaintiff's residual functional capacity, as assessed by the ALJ, could perform.

Plaintiff was represented by counsel at the hearing, and her counsel also questioned the vocational expert. An ALJ's hypothetical question is defective and will not be allowed to stand unless it reasonably incorporated all of the disabilities recognized by the ALJ, "and the claimant or his representative is afforded the opportunity to correct deficiencies in the ALJ's question by mentioning or suggesting to the vocational expert any purported defects in the hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)." Bowling v. Shalala, 36 F.3d 431, 436 (5th Cir. 1994). The hypothetical in this case met these standards.

Substantial evidence supports the ALJ's finding that Billado does not have additional limitations beyond what the ALJ included in his hypothetical. Therefore, the ALJ was not required to include such additional limitations in his hypothetical. Carey v. Apfel, 230 F.3d 131, 143 (5th Cir. 2000).

The vocational expert's testimony is substantial evidence on which the ALJ can rely to determine that plaintiff can perform light work with the restrictions noted in his opinion.

<u>CONCLUSION</u>

The ALJ did not err by failing to accord controlling weight to Dr. Hudspeth's March 2007 opinion.  Substantial evidence supports the ALJ's findings concerning plaintiff's residual functional capacity.

**<u>RECOMMENDATION</u>**

For the foregoing reasons, IT IS RECOMMENDED that plaintiff's complaint be DISMISSED WITH PREJUDICE.

A party's failure to file written objections to the proposed findings, conclusions, and recommendations in a magistrate judge's report and recommendation within ten (10) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  <u>Douglass v. United Servs. Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this __9th__ day of July, 2008.

_____
JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE